IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| MANTISSA CORPORATION, | ) ) ) |  |
| Plaintiff, | ) ) | 17 C 9174 |
| v. | ) ) | Hon. Virginia M. Kendall |
| FIRST FINANCIAL CORPORATION, and FIRST FINANCIAL BANK, N.A., | ) ) ) ) |  |
| Defendants. | ) ) |  |

**MEMORANDUM ORDER AND OPINION**

Plaintiff Mantissa Corporation ("Mantissa") sued Defendants First Financial Corporation and First Financial Bank, N.A., (collectively, "First Financial") for infringement of United States Patent No. 9,361,658 (the "'658 patent"). The Court held a claim construction hearing on November 4, 2021, at which time it heard evidence and argument regarding the proper construction for two disputed claim terms.[1] The Court's construction of these terms is set forth below.

**BACKGROUND**

The '658 Patent, titled "System and Method for Enhanced Protection and Control Over the Use of Identity," was issued on June 7, 2016, and is generally directed to "to the protection of identity by controlling access to use of an identity." '658 patent, 1:20-21. The invention "provides protection of the identity of an entity by placing limitations or conditions on its use, and whereby the entity's use-enabling identification information is not needed to authorize a transaction." *Id.* at

---

[1] Prior to the hearing, the parties briefed their proposed constructions. *See* Dkt. 63 (Defendant's Opening Claim Construction Brief); Dkt. 67 (Plaintiff's Claim Construction Brief); Dkt. 69 (Defendant's Reply Claim Construction Brief); Dkt. 71 (Joint Claim Construction Chart). The parties also submitted declarations from Dr. Thomas Rhyne (Dkts. 64 and 66-1) and co-inventor of the '658 patent, Gary Dennis. (Dkt. 68).

1

1:21-25. Mantissa, a software company that develops identity protection solutions, asserts all 16 claims against First Financial, of which claims 1, 7, and 13 are independent:

> 1. A method for a service provider to control use of an entity's financial account to facilitate transactions, comprising:
> setting scope of use, defined by the entity via a network, for the financial account, including at least:
>> (a) the financial account to either OFF or ON;
>> (b) for a plurality of individual categories, whether each category is authorized or unauthorized for transactions using the financial account, each category representing a different type of transaction partner; and
>> (c) a geographical scope reflecting a geographic area in which transactions are authorized;
>
> receiving, via a network from a source other than the entity, an inquiry regarding a proposed transaction that would use the financial account;
> determining, relative to the scope of use, whether the financial account may or may not be used for the proposed transaction, comprising:
>> denying when the financial account is OFF;
>> denying when the financial account is ON and the proposed transaction falls within a category that is unauthorized;
>> denying when the financial account is ON, the proposed transaction falls within a category that is authorized and when a location of the proposed transaction is outside of the geographical area;
>> permitting when (a) the financial account is ON, (b) the proposed transaction falls within a category that is authorized, (c) a location of the proposed transaction is inside the geographical area, and (d) the proposed transaction is not otherwise impermissible; and
>
> responding to the inquiry by providing, via a network to the source, first information based on the result of the determining.
>
> 7. A method for a service provider to control use of an entity's financial account to facilitate transactions, the method being executed on electronic computer hardware in combination with software, the method comprising:
> setting scope of use, as defined by the entity via a network, for the financial account, including at least:
>> (a) setting a state status of the financial account to either an OFF or ON state;
>> (b) setting a category status for each category of a plurality of categories as either authorized or unauthorized for transactions using the financial account, each category representing a type of transaction partner; and
>> (c) setting a distance from the entity, where the entity's financial account can be used within said distance;
>
> receiving, via a network from a source other than the entity, an inquiry regarding a proposed transaction on the financial account;
> determining, relative to the scope of use, a response status to the inquiry reflecting whether the financial account may or may not be used for the proposed transaction, comprising:

> setting the response status to impermissible when the state status for the financial account is OFF;
> setting the response status to impermissible when the state status for the financial account is ON and the proposed transaction falls within a category having an unauthorized category status;
> setting the response status to impermissible when the state status for the financial account is ON, the proposed transaction falls within a category having an authorized category status and the distance from the entity where the entity's financial account can be used is outside said distance;
> setting the response status to permissible when (a) the state status of the financial account is ON, (b) the proposed transaction falls within a category having an authorized category status, (c) the distance from the entity where the entity's financial account can be used is within said distance, and (d) the proposed transaction is not otherwise impermissible; and
>
> responding to the inquiry by providing, via a network to the source, first information based on the response status of the determining.

> 13. A method of protecting use of an entity's financial account, the method being executed on electronic computer hardware in combination with software, the method comprising:
> storing data representing:
>> first identification information of an entity; and
>> at least one criteria previously defined by the entity for allowing and/or limiting the use of the financial account, the at least one criteria defining at least one non-monetary circumstance under which the financial account can be used;
>>
>> receiving, via a network from a source other than the entity, a request to determine whether a proposed use of the entity's financial account by a party at a location is allowable, the request including second identification information;
>> comparing at least some of the first identification information with at least some of the second identification information;
>> determining whether the proposed use of the entity's financial account by the party at the location is authorized for the proposed use, comprising:
>>> determining whether the entity's financial account is in an entity established ON or OFF state;
>>> determining whether or not the at least one criteria blocks the proposed use, with the at least one criteria blocks comprising at least one of:
>>>> a geographical limitation on where the financial account can be used; and
>>>> a distance from the entity within which the financial account can be used; and
>>>
>> responding to the request by providing, via a network to the source, response information based on the result of said determining.

The parties dispute the meaning of the claim term "transaction partner" (First Financial) or the broader term "category representing a type of transaction partner" (Mantissa) in claims 1 and

7 of the '658 patent. The parties also dispute the proper construction of the term "OFF" in claims 1 and 7 and the term "OFF state" in claim 13.

## LEGAL STANDARD

Claim construction resolves disputed meanings in a patent to clarify and explain what the claims cover. *See Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1382 (Fed. Cir. 2005). The construction of the claims at issue is a legal determination to be made by the court. *See id.* (*citing Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995)). Generally, the terms of a claim are given the ordinary and customary meaning that the terms would have to a person of ordinary skill in the art at the time of the filing date of the patent application. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). When interpreting an asserted claim, the court looks first to intrinsic evidence: the words of the claims, the patent specification, and the prosecution history. *See id.* at 1316-18.

The claim language is the starting point for claim construction analysis because it frames and ultimately resolves all issues of claim interpretation. *See Sumitomo Dainippon Pharma Co., Ltd. v. Emcure Pharmaceuticals Limited,* 887 F.3d 1153, 1157-58 (Fed. Cir. 2018); *Robotic Vision Sys., Inc. v. View Eng'g Inc.*, 189 F.3d 1370, 1375 (Fed. Cir. 1997). In some cases, the "ordinary and customary" meaning of the claim language may be readily apparent, even to lay judges, and the court applies the widely accepted meaning of the commonly understood words. *See Phillips*, 415 F.3d at 1314. In such cases, a general-purpose dictionary may be helpful. *See id.* In many cases, however, the court must proceed beyond the bare language of the claims and examine the patent specification. *See id.* at 1314-15. "The person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. The specification is usually dispositive; "'it is the single best guide to the meaning of a disputed term.'" *Id.* at 1315

4

(*quoting Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). In the specification, the patentee provides a written description of the invention that allows a person of ordinary skill in the art to make and use the invention. *See id.* at 1323. At times, the patentee uses the specification to "set forth an explicit definition for a claim term that could differ in scope from that which would be afforded by its ordinary meaning." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001).

The court may also look to the patent's prosecution history. *See Phillips*, 415 F.3d at 1317. While the prosecution history often lacks the clarity of and is less useful than the specification, it may inform the court of the meaning of a claim term by illustrating how the inventor understood the invention as well as how the inventor may have limited the scope of the invention. *See id.* The prosecution history is generally relevant if a particular interpretation of the claim was considered and specifically disclaimed during the prosecution of the patent. *See Schumer v. Lab. Comp.* Sys., 308 F.3d 1304, 1313 (Fed. Cir. 2002).

Finally, a court may also consult "extrinsic evidence," such as dictionaries, treatises, and expert testimony, to "shed useful light on the relevant art." *Phillips*, 415 F.3d at 1317-18. Generally, extrinsic evidence is "less reliable" than intrinsic evidence and is "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19. With respect to the use of dictionaries, technical or general, a court may consult such evidence "so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Id.* at 1322-23.

5

## DISCUSSION

I. **"transaction partner" / "category representing a different type of transaction partner" ('658 patent, claims 1,7)**

| Mantissa's Proposed Construction[2] | First Financial's Proposed Construction |
|---|---|
| Broader claim term "category representing a different type of transaction partner" means "class of goods or services provided by a type of seller such as hospitals, pharmacies, liquor stores, gas stations, and restaurants" | "transaction partner" is indefinite |

### A. Legal Standard for Indefiniteness

To be sufficiently definite, a patent "specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention." 35 U.S.C. § 112(b). A patent claim is indefinite if it fails to provide a person of ordinary skill in the art reasonable certainty regarding the scope of the claimed invention. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901, 134 S.Ct. 2120, 189 L.Ed.2d 37 (2014). "[T]he dispositive question in an indefiniteness inquiry is whether the 'claims,' not particular claim terms, 'read in light of the specification delineating the patent, and the

---

[2] First Financial objects to Mantissa's proposed construction because Mantissa did not disclose its construction prior to briefing as required by the Local Patent Rules. Mantissa is admonished to follow the Local Patent Rules, which exist to "require parties to crystallize their theories of the case early in the litigation" and thus prevent a "shifting sands" approach to claim construction. *See O2 Micro Intern. Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1364 (Fed. Cir. 2006) (internal citations omitted). Still, the Court will not strike Mantissa's proposed constructions. The Court will permit and has considered the supplemental declaration of Dr. Rhyne which was submitted specifically to address Mantissa's belatedly disclosed proposed constructions. (Dk. 69 at 9-10). In addition, the parties had two years between briefing and oral argument on these claim terms. Finally, at claim construction the Court is not bound to choose solely from constructions proposed by the parties, but rather "has an independent obligation to determine the meaning of the claims, notwithstanding the views asserted by the adversary parties." *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1555 (Fed. Cir. 1995); *see also Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1323-24 (Fed. Cir. 2008) ("Because the court has an independent obligation to construe the terms of a patent, we need not accept the constructions proposed by either party ...."). Therefore, the Court will consider all evidence before it to reach its decision.

prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.'" *Cox Commc'ns, Inc. v. Sprint Commc'n Co.*, 838 F.3d 1224, 1231 (Fed. Cir. 2016) (quoting *Nautilus*, 572 U.S. at 910). United States patents are accompanied by a presumption of validity, 35 U.S.C. § 282, and invalidity must be established by clear and convincing evidence. *Nature Simulation Sys. Inc. v. Autodesk, Inc.*, 23 F.4th 1334, 1337 (Fed. Cir. 2022) citing *Sonix Tech. Co. Ltd. v. Pubs. Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017). "The indefiniteness inquiry ... is intertwined with claim construction ...." *Eidos Display, LLC v. AU Optronics Corp.*, 779 F.3d 1360, 1364 (Fed. Cir. 2015).

### B. Person of Ordinary Skill in the Art ("POSA")

Indefiniteness is determined based on whether a person of ordinary skill in the art ("POSA") would have "reasonable certainty" regarding the scope of the invention. *Nautilus*, 572 U.S. at 901. Mantissa objects that Dr. Rhyne is not a POSA in the field of the invention for the '658 patent. (Dkt. 67 at 12).

Mantissa's definition requires that a POSA have "(i) a bachelor's degree in Electrical Engineering or Computer Science, or an equivalent degree, and at least three years of experience in the field of systems for processing and authorizing transactions in a financial account over a computer network or (ii) at least five years of experience in such field." (*Id*. at 3). Mantissa argues that this definition should exclude Dr. Rhyne, who does not have "at least three years of experience in the field of systems for processing and authorizing transactions in a financial account over a computer network." In contrast, First Financial defines a POSA as an individual that would typically "have a bachelor's degree in electrical engineering or computer science and preferably three years of work experience with computer networks related to financial systems." (Dkt. 63).

7

First Financial's definition of a POSA comports with the definition accepted by the district court in *Mantissa Corp. v. Ondot Sys., Inc.*, Case No. 4:15-cv-01133 (S.D. Tex.); *see also* Dkt. 70 Ex. 2. There, the court construed terms in U.S. Patent Nos. 7,779,456 and 8,353,027, which are related to the '658 patent being litigated in this case and share much of the same specification. In doing so, the district court—relying on testimony from Dennis—considered a POSA to be an individual that "will typically have a bachelor's degree in electrical engineering or computer science and preferably three years of work experience with computer networks related to financial systems." *Id.* at 2-3.

Having considered the parties' proposals, and consistent with the Texas litigation concerning related patents, the Court agrees with First Financial and finds that a person of ordinary skill in the art would "have a bachelor's degree in electrical engineering or computer science and preferably three years of work experience with computer networks related to financial systems." Mantissa's objection to Dr. Rhyne is overruled.

### C. Claim Language / Proposed Constructions

Claim 1 of the '658 patent covers "[a] method for a service provider to control use of an entity's financial account to facilitate transactions, comprising: setting scope of use, defined by the entity via a network, for the financial account, including at least: . . . (b) for a plurality of individual categories, whether each category is authorized or unauthorized for transactions using the financial account, **each category representing a different type of transaction partner** . . ." '658 patent, cl. 1 (emphasis added). Independent claim 7 similarly covers "[a] method for a service provider to control use of an entity's financial account to facilitate transactions, the method being executed on electronic computer hardware in combination with software, the method comprising: setting scope of use, as defined by the entity via a network, for the financial account, including at least: .

8

. . (b) setting a category status for each category of a plurality of categories as either authorized or unauthorized for transactions using the financial account, **each category representing a type of transaction partner** . . ." '658 patent, cl. 7 (emphasis added).

First Financial contends that the term "transaction partner" used in these claims of the '658 patent renders those terms indefinite under 35 U.S.C. § 112(b).[3] Mantissa disagrees, and proposes that a broader part of the claim, "category representing a different type of transaction partner," should be construed to mean "class of goods or services provided by a type of seller such as hospitals, pharmacies, liquor stores, gas stations, and restaurants." (Dkt. 71).

### D. Intrinsic Evidence

First Financial, through its expert Dr. Rhyne, argues that the specification and prosecution history provide no insight to a POSA about the meaning of "transaction partner" and so the Court should look directly to extrinsic evidence. However, "[a] party cannot transform into a factual matter the internal coherence and context assessment of the patent simply by having an expert offer an opinion on it. The internal coherence and context assessment of the patent, and whether it conveys claim meaning with reasonable certainty, are questions of law." *Sonix Tech. Co.*, 844 F.3d at 1376 citing *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1342 (Fed. Cir. 2015)). It is not enough for a POSA to opine that the intrinsic evidence (or lack thereof) renders a claim indefinite.

The term "transaction partner" appears only in the claims of the '658 patent, and the surrounding claim language "category representing a type of transaction partner" provides no objective criteria for what might be considered a transaction partner. Patent law, however, does

---

[3] The Leahy-Smith America Invents Act (AIA) reorganized 35 U.S.C. § 112 into lettered subsections, and the newer subsections applies to patent applications filed on or after September 16, 2012. *See Zeroclick, LLC v. Apple, Inc.*, 891 F.3d 1003, 1006 n.2 (Fed. Cir. 2018). Because the application for the '658 patent was filed March 18, 2014, the Court cites to the AIA version of 35 U.S.C. § 112.

9

not require a term to appear or be defined in the specification for there to be reasonable certainty as to its meaning. *See Interval Licensing*, 766 F.3d at 1364. Here, Mantissa argues that certain examples in the specification provide "examples of these categories" that render the claims sufficiently definite and support its construction. (Dkt. 68 at 4). A claim term can be rendered definite using examples in the specification, but those examples must provide some objective criteria by which a POSA can determine the scope of a claim with reasonable certainty. *See Sonix Tech. Co., Ltd.*, 844 F.3d at 1379 (Fed. Cir. 2017). The mere existence of examples in the written description will not always render a claim definite. *Id.*, 844 F.3d at 1380.

Mantissa submits a declaration from Dennis, the co-inventor of the '658 patent, that identifies embodiments in the specification but does little more than conclude that these embodiments render the claim term "category representing a different type of transaction partner" definite. For instance, the specification describes an embodiment relating to medical information. '658 patent 5:45-55 ("The information which identity owner 30 provides to service provider 10 reflects the identity of the identity owner 30 to, by way of non-limiting example allow, deny, limit, secure, protect or otherwise control a type of use of the identity of an entity. The nature and scope of the control and management of identity use is essentially unlimited and based only on the parameters as may be defined by user 20 and identity owner 30. By way of non-limiting example, identity owner 30 could set up account profile 14 as follows: (1) credit cards can only be used between 9 AM and 11 PM. (2) medical information is available at all times but only to users 20 that are pre-authorized for health services (e.g., doctors, hospitals, pharmacies). (3) applications for loans or new credit are never to be approved.") This embodiment identifies different type of "health services" which Mantissa argues are "categories" that can be imputed into the meaning of "category representing a different type of transaction partner." While it is true that doctors,

hospitals, and pharmacies are identified as health services, there is nothing in this embodiment that explains to a POSA what a "transaction partner" for a financial account (as claimed in the '658 patent) is and is not.

Another example in the specification pertains to an "identity owner 30 who wants to maintain confidentiality of his medical records but wants to preserve quick access in emergencies can set identity attributes 13 in account profile 14 to only approve identity state requests 111 from authorized health-care-related institutions." '658 patent, 6:40-51. This is an embodiment directed at an account holder's control of their medical records.[4] It provides no criteria for what a "transaction partner" may include (or not include) in claims 1 and 7 and their dependent claims. Finally, the specification discusses an example where "an identity owner 30 who spends too much money at a certain store or type of store can set identity attributes 13 in account profile 14 to deny requests from that store or type of store." *Id.* This example does not shed any light on the objective bounds of a "transaction partner." In a favorable reading, this example explains how an identity owner could set identity attributes to deny requests from one type of store (like a liquor store or restaurants) – but that is much narrower than the claim language "each category representing a different type of transaction partner."

Recent cases from the Federal Circuit finding claims sufficiently definite under 35 U.S.C. 112 each relied on intrinsic evidence that provided the objective criteria necessary to identify the characteristics of the term being challenged. *See, e.g., Sonix Tech. Co., Ltd.*, 844 F.3d at 1379

---

[4] Despite First Financial's argument to the contrary, the fact that this intrinsic evidence is not directly related to "financial accounts" is not fatal—an unclaimed embodiment used in a similar context to the claim term can be used to "support[] the conclusion that a person of ordinary skill in the art would adopt the same understanding for the same limitation." *Eidos Display, LLC v. AU Optronics Corp.*, 779 F.3d 1360, 1367 (Fed. Cir. 2015). What is fatal, here, is that the embodiments do not adequately support the conclusion that a POSA would understand, from broad examples of "categories," used in different contexts, what would constitute a "transaction partner."

(claim term "visually negligible" did not render claims indefinite because examples in the specification provided objective criteria by which a POSA could identify the scope of the invention with reasonable certainty); *Guangdong Alison Hi-Tech Co. v. Int'l Trade Comm'n*, 936 F.3d 1353, 1360–62 (Fed. Cir. 2019) (holding the term "lofty fibrous batting" was sufficiently definite where the specification provided detailed examples, and the parties' expert testimony supported the conclusion that a POSA could objectively identify characteristics of the term); *One-E-Way, Inc. v. Int'l Trade Comm'n*, 859 F.3d 1059, 1066 (Fed. Cir. 2017) (holding the term "virtually free from interference" definite where statements in the specification and prosecution history indicated that the phrase meant "free from eavesdropping," which provided an objective standard to inform a POSA of the scope of the invention with reasonable certainty). By comparison, the specification here provides no such criteria for the term "transaction partner."

Here, Mantissa's cited embodiments do not support its construction of "category representing a different type of transaction partner" nor adequately inform a POSA of the invention's metes and bounds. The specification of the patent does not contain the objective criteria of what should be considered a "transaction partner" necessary to provide "reasonable certainty" of the objective scope of the claims. *Nautilus*, 572 U.S. at 901. The prosecution history provides no further insight. The '658 patent claims priority to U.S. Application No. 11/115,239, filed on April 27, 2005. The application did not use the term "transaction partner" anywhere in the original claims or specification. (*See generally* Dkt. 65-2). The application that issued as the '658 patent, the '128 patent filed on March 18, 2014, also did not originally contain the term "transaction partner." (*Id.*). On September 3, 2014, a preliminary amendment to the application cancelled the original claims and added a new set of claims. (Dkt. 65-2 at Mantissa 000586-592). A newly added claim added the language: "for a plurality of individual categories, whether each

category is authorized or unauthorized for transactions using the financial account, each category representing a different type of transaction partner." *Id*. This preliminary amendment did not explain the meaning of "transaction partner" or provide any other context. Additional communication between the examiner and the patentees prior to issuance of the '658 patent also does not provide any further discussion of the term "transaction partner."

### E. Extrinsic Evidence

As the intrinsic evidence does not provide "reasonable certainty" as to the meaning of "transaction partner," the Court looks to the extrinsic evidence presented by the parties. As in claim construction, in making an indefiniteness determination, the district court may make "any factual findings about extrinsic evidence relevant to the question, such as evidence about knowledge of those skilled in the art . . . ." *See BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017).

The extrinsic evidence reflects that there is no commonly accepted definition of a "transaction partner." *See, e.g.,* Dkt. 64 at ¶51-52. Dr. Rhyne presented four possible definitions for "transaction partner" found in the art around the time of the invention that a POSA could reasonably ascribe to the term: (1) service provider; (2) users or vendors on a common computer network; (3) users involved in a transaction; or (4) wireless devices used to make the transaction. *See* Dkt. 64 ¶ 59; *see also* Dkt. 64 Exs. 6-9. Dennis, in support of Mantissa's construction that essentially equates "transaction partner" with "type of seller," presents art related to "Merchant Category Codes." *See* Dkt. 68, Exs. 1-3. Some of these definitions are perhaps more plausible than others—as Mantissa points out, it seems unlikely that "transaction partner" would mean "service provider" when the term "service provider" is used elsewhere in the claims of the '658 patent. But even discounting that potential definition, the Court is still left with several plausible

13

constructions. At most, the extrinsic evidence presented by Dennis (although it does not directly provide any context for "transaction partner") provides yet *another* possible definition, in addition to those presented by Dr. Rhyne. The extrinsic evidence thus cannot save the claims, because there is no commonly understood definition of "transaction partner" and there are various meanings of "transaction partner" in the field with no one established meaning in the art.

In this case, the specification and prosecution history do not provide objective criteria for a POSA to determine what constitutes a "transaction partner" as claimed in the '658 patent, even read in the context of "category representing a different type of transaction partner." This is consistent with the extrinsic evidence presented by Dr. Rhyne (and Dennis, the co-inventor of the '658 patent) that suggests several viable meanings for "transaction partner" as used in the claims of the '658 patent. Because there is insufficient guidance in the specification, and the extrinsic evidence shows several reasonable meanings of "transaction partner" as used in the '658 patent, a POSA cannot ascertain the objective boundaries of the claims. Therefore, claims 1 and 7, "read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Cox Commc'ns, Inc.*, 838 F.3d at 1231. Claims 1 and 7 are indefinite.

II. "the financial account is OFF" / "OFF state" ('658 patent, claims 1, 7, 13)

| Mantissa's Proposed Construction | First Financials' Proposed Construction |
|---|---|
| "a status in which a use of the financial account is to be denied" | "a status in which any use of the financial account is to be denied"[5] |

---

[5] First Financial first offered the construction "a state in which any use of the financial account is denied" and later amended to its current proposed construction "to avoid [] unnecessary disputes." Reply at 8.

First Financials contends that the claim terms "off" and "off state" should mean "a status in which any use of the financial account is denied." Mantissa argues that the terms should instead be construed to mean "a status in which a use of the financial account is to be denied." (Dkt. 71).

The three uses of the terms "off" and off state" appear in the independent claims as follows:

**Claim 1:** A method for a service provider to control use of an entity's financial account to facilitate transactions, comprising: setting scope of use, defined by the entity via a network, for the financial account, including at least: **(a) the financial account to either OFF or ON** . . . determining, relative to the scope of use, whether the financial account may or may not be used for the proposed transaction, comprising: **denying when the financial account is OFF** . . .

**Claim 7:** A method for a service provider to control use of an entity's financial account to facilitate transactions, the method being executed on electronic computer hardware in combination with software, the method comprising: setting scope of use, as defined by the entity via a network, for the financial account, including at least: **(a) setting a state status of the financial account to either an OFF or ON state** . . . determining, relative to the scope of use, a response status to the inquiry reflecting whether the financial account may or may not be used for the proposed transaction, comprising: setting the response status to **impermissible when the state status for the financial account is off** . . .

**Claim 13:** A method of protecting use of an entity's financial account, the method being executed on electronic computer hardware in combination with software, the method comprising:. . .determining whether the proposed use of the entity' s financial account by the party at the location is authorized for the proposed use, comprising: **determining whether the entity's financial account is in an entity established ON or OFF state**. . .

'658 patent, cls. 1, 7, 13 (emphasis added). Each of these claims thus is directed to a method comprising several steps meant to protect a financial account from unauthorized use, and further to facilitate authorized transactions or other usage. In claims 1 and 7, this requires two relevant steps: first, the method requires that the scope of use be set whereby the status of the financial account is either OFF or ON. Then, if the status of the account is OFF, claim 1 requires "denying [the transaction] when the account is OFF" while claim 7 similarly requires "setting the response status to impermissible when the state status for the financial account is off." There is nothing in the claim language to suggest that any use of the account is permissible or allowed by the claims

15

if the account status is set to OFF. Only if it is set to ON (and the other claimed criteria are met) can the account be used. This comports with First Financial's proposed construction that *any* use of the account is denied when the account is OFF, because the claims *require* denial when OFF. While Mantissa suggests that the status being set to OFF only causes the denial of "a" requested transaction, there is nothing in the claims that explains what (if any) uses would be permitted if the account is OFF. On the face of the claims, when a financial account is set to OFF, use of the account is always denied or impermissible.

Still, claims must be read in "light of the specification." *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.,* 868 F.2d 1251, 1257 (Fed. Cir. 1989). A review of the relevant intrinsic evidence in the specification further supports First Financial's construction. Beyond the claim language, there are several uses of the "state" of a financial account or profile that shed light on the claims. For instance, the specification describes an example where "object template 16 allows an identity owner 30 to set the default status of the credit identification instrument (e.g., the credit card or underlying account) as on or off. In this example, identity owner 30 sets the default of the credit card to 'deny,' essentially placing the use of the credit card, in a lockdown state." '658 patent, 8:58-63. That example goes on to explain that the identity owner wants to use the credit card at a particular time, it can contract the service provider to "change identity state 17 at the appropriate time." *Id.* at 8:63-67. In this example, use of the card is permitted during that two-hour window, but "after it closes, the default state is 'deny' thus preventing any unauthorized (or even authorized) use outside that window." *Id.* at 9:1-5. In another example, pertaining to credit reporting, the specification describes a situation where a customer applies for a loan at a federal bank. *Id.* at 12:5-51. After an "identity account profile 14" is identified, "the credit reporting agency contacts supplier 19 and requests identity state 17 . . . Interpreter 18, acting as an agent of service provider

16


10 . . . determines identity state 17. . . . Further examination of identity objects 12 in account profile 14 shows that identity state 17 has been set to 'Type—Identity OFF'. Since no other identity objects 12 exist for this identity owner 30 that supersede this identity state 17, interpreter 18 informs supplier 19 that identity state 17 is 'deny' and, thus, any use of the identification information of identity owner 30 should be denied." *Id.* 12:21-40. In both examples, the "OFF" status of an account prevents "any" further use. While it is true, as Mantissa argues, that examples in the specification need not be imputed into the claim language, it presents *no* contrary intrinsic evidence that supports a use of the "financial account" when it is in the OFF state.[6] Therefore, based on the plain language of the claims, in view of the specification, "OFF" and "OFF state" as used in claims 1, 7, and 13 are construed to mean "a status in which any use of the financial account is to be denied."

## CONCLUSION

For the reasons given herein, the Court finds claims 1 and 7 of the '658 patent to be indefinite and otherwise construes the disputed terms as set forth above.

_(signature)_

Hon. Virginia M. Kendall
United States District Judge

Date: May 8, 2022

---

[6] While the Court does not reach the issue of indefiniteness of this claim term because it has adopted First Financial's construction of "OFF" and "OFF state", Mantissa's proposed construction of these terms would require the Court to consider when an account can be used despite an OFF status without the benefit of *any* criteria, examples, or descriptions in the intrinsic evidence to make that determination.